AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>SAMSUNG CELLPHONE IMEI 354526111864365<br>CURRENTLY STORED AT FBI OFFICES IN BEDFORD,<br>NEW HAMPSHIRE | ) ) ) ) ) ) )   Case No.  26-mj-220-01-AJ |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ District of _____New Hampshire_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(2) | Receipt of Child Pornography |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Tarah E. Little

*Applicant's signature*

Tarah E. Little, FBI, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: _____July 21, 2026_____

*Judge's signature*

City and state:  Concord, New Hampshire

Andrea K. Johnstone, United States Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT | Case No. 26- |

AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR A SEARCH WARRANT

I, Tarah Little, a Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

**INTRODUCTION**

1.    I have been employed as an FBI Special Agent since 2015, and am currently assigned to the Boston Field Office, Bedford Resident Agency. I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. § 2252A(a)(2) and (b)(2) related to the receipt of child sexual abuse materials in the District of New Hampshire. I have investigated federal criminal violations related to high technology or cyber-crime, child exploitation, and child pornography. I have received training in the area of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media.

2.    This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following property, further described in Attachment A:

i)  A Samsung phone IMEI 354526111864365, seized on July 8, 2026, during the arrest of Mason Zimmer, the "SUBJECT DEVICE," for contraband and evidence, fruits, and instrumentalities of violations or attempted violations of 18 U.S.C. §§ 2252A(a)(2) and (b)(2) (receipt of child pornography) which items are more specifically described in

Attachment B of this Affidavit. Attachments A and B are incorporated into this Affidavit by reference.

3.    The statements contained in this affidavit are based on, among other things, my own investigation; information provided by other law enforcement agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of administrative subpoenas; the results of physical surveillance conducted by law enforcement agents; independent investigation and analysis by law enforcement agents/analysts and computer forensic professionals; and my experience, training and background as a Special Agent.  Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations or attempted violations of 18 U.S.C. §§ 2252A(a)(2) and (b)(2) (receipt of child pornography) is presently located on the SUBJECT DEVICE.

## STATUTORY AUTHORITY

4.    As noted above, this investigation concerns alleged violations of the following: 18 U.S.C. §§ 2252A(a)(2) and (b)(2) (receipt of child pornography).

a.    18 U.S.C. § 2252A(a)(2) and (b)(2) prohibit any person from knowingly receiving or attempting to receive any material that contains child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

2

5. The following definitions apply to this Affidavit and Attachment B:

a. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

c. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph (in whatever form, e.g., digital and printed photographs), film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct or the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d. "Child sexual abuse material" or "CSAM," as used herein, has the same meaning as the term "child pornography," defined above.

e. "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

3

f.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

g.      "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

h.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code

4

may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

     i.     "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

     j.     "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

     k.     A provider of "Electronic Communication Service", as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications. For example, "telephone companies and electronic mail companies" generally act as providers of electronic communication services. See S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

     l.     The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. The internet is a means or facility of interstate or foreign commerce.

     m.     "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the

5

Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

n.    An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses.

o.    A "link," "hyperlink," "Uniform resource locator," "URL," "URL link," or "web address" all refer to the location of a specific webpage on a computer network such as the Internet. These locations are represented by a series of characters and symbols in a standard form that, when clicked, tapped, or inserted into a web browser, instructs the computer to fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet. From the perspective of a computer user, that user will be redirected to another location or web page on the Internet or another network. URLs often take the form of "https://www.google.com" or "https://www.justice.gov." URLs can also specific a specific page or file within a larger website, such as "https://www.justice.gov/psc" or "https://www.fbi.gov/investigate/violent-crime/vcac."

p.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

q.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

6

r.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

s.    "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

t.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

u.    A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

v.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND TO THE INVESTIGATION

6.  On February 20, 2025, Hudson, New Hampshire Police Department ("HPD") responded to a residence regarding a nine-year-old male juvenile ("MINOR VICTIM 1") receiving and

7

being asked for sexually explicit photographs on Snapchat from Snapchat username "Zimmma5017".

7.     Beginning February 18, 2025, the following conversation ensued between MINOR VICTIM 1, who was located in New Hampshire, and "Zimmma5017":

**Zimmma5017**: Age

**MV1**: 9

**Zimmma5017**: No ur not

**Zimmma5017**: Show ur pp then buddy

**MV1**: No

**Zimmma5017**: Is ur pp big

**MV1**: No

**Zimmma5017**: Mine is

**MV1**: No

**Zimmma5017:** U wanna see it

**MV1:** ?

**Zimmma5017:** My pp

**MV1:** ?

**Zimmma5017:** It's big

**Zimmma5017:** Show ur pp

[LATER IN THE CONVERSATION]

**Zimmma5017:** Can I show u my pp

**Zimmma5017:** It's really cool

**MV1:** Ok?

8

**Zimmma5017:** [Silent Snap Sent]

**Zimmma5017:** Well

**Zimmma5017:** What u think of it

**[External Media Picture]**

**Zimmma5017:** U see my pp

**MV1:** No

**Zimmma5017:** Oh

**Zimmma5017:** It's big

**Zimmma5017:** [Silent Snap Sent]

**Zimmma5017:** What do u see in the pic I sent you

**Zimmma5017:** Huh

**MV1:** I am 9 years

**Zimmma5017:** Im 12

**MV1:** Ok

**Zimmma5017:** U like my pp

**MV1:** No

[LATER IN THE CONVERSATION]

**Zimmma5017:** Show ur pp more

**MV1:** [Sends image of a prepubescent male. His pants are pulled down, and his penis is exposed towards the camera]

**Zimmma5017:** U like my pp

**Zimmma5017:** I like yours

**Zimmma5017:** Do u like my pp

9

**MV1:** Ok

8. Within the conversation multiple child sex abuse images ("CSAM") were sent by MINOR VICTIM 1. MINOR VICTIM 1 also received multiple images of what appeared to be an adults penis and anus from Zimmma5017.

9. The user of the "Zimmma5017" account was later identified through legal process as Mason Zimmer, with a last known address in Belleville, MI ("ZIMMER"). Further investigation led law enforcement to believe that ZIMMER was staying at an apartment in Milan, MI.

10. In September, 2025, with the assistance of Michigan State Police, a Michigan State search warrant Michigan was executed at the apartment where ZIMMER was residing.

11. Seized during the search was ZIMMER's Wingtech Android 12 REVVL V+ 5G IMEI 357492493118879. ZIMMER provided police with the passcode to access the phone. The phone was then stored at the Michigan State Police Cyber Crimes Unit in Livonia, MI.

12. On September 29, 2025, the cell phone was turned over to the FBI. During a manual review of the device, the Snapchat application was located on the phone. Numerous CSAM images, including the ones that MINOR VICTIM 1 had sent to ZIMMER, were also located in the internal section of the phone.

13. On April 2, 2025, Snapchat provided HPD with a search warrant return for "Zimmma5017." During a review of the return, it was determined ZIMMER was likely talking to and seeking CSAM from multiple minors.

14. On January 6, 2026, during a Child Adolescent Forensic Interview ("CAFI"), a 17-year-old juvenile ("MINOR VICTIM 2") identified himself in multiple CSAM images and

video in chats between himself and ZIMMER. These chats occurred in March 2025 when MINOR VICTIM 2 was 16 years old at the time.

15. On April 22, 2026, during a CAFI, a 15-year-old juvenile ("MINOR VICTIM 3") identified himself in a CSAM image in a chat between him with ZIMMER. This chat occurred on February 20, 2025, when MINOR VICTIM 3 was 14 years old at the time.

16. On May 20, 2026, a federal Grand Jury in New Hampshire returned an indictment charging ZIMMER with one count of 18 U.S.C. § 2251(a), Child Exploitation, and one count of 18 U.S.C. § 2252A(a)(2) & (b)(1), Receipt of Child Pornography.

17. On July 8, 2026, Taylor, Michigan Police Department ("TPD") arrested ZIMMER outside of a hotel on the outstanding warrant out of the District of New Hampshire. During the arrest the SUBJECT DEVICE was found on his person. Later that day, FBI Agents picked up ZIMMER from TPD and transported him to the United States Marshals Service. During the transport, after being told what he was he arrested for, ZIMMER spontaneously stated to the FBI Agents that he did not ask for CSAM, but rather, "they just gave it up."

## BACKGROUND ON CHILD SEXUAL ABUSE MATERIAL, COMPUTERS, AND THE INTERNET

18. I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

   a. Computers and digital technology are the primary way in which individuals interested in child sexual abuse material interact with each other.  Computers basically serve four functions in connection with CSAM: production, communication, distribution, and storage.

   b. Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or

11

smartphone to the computer using a cable or via wireless connections such as "Wi-Fi" or "Bluetooth." Additionally, images and videos taken by a digital camera or smartphone can be automatically copied to cloud-based storage using either the wireless network or cellular connection. Images and videos can also be shared through numerous applications on the smartphone including messages, applications, photo-sharing applications, and other image- or video-based applications. Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands or tens of thousands of high-resolution photographs or hundreds of hours of videos.

c.    A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. CSAM can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.    The computer's ability to store images in digital form makes the computer itself an ideal repository for CSAM. Electronic storage media of various types—to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer—can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can

12

easily be concealed and carried on an individual's person.  Smartphones and/or mobile phones are also often carried on an individual's person and in their motor vehicles.

e.      The Internet affords individuals several different venues for obtaining, viewing, and trading CSAM in a relatively secure and anonymous fashion.

f.      Individuals also use online resources to retrieve and store CSAM.  Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet.  Even in cases where online storage is used, however, evidence of CSAM can be found on the user's computer, smartphone, external media, and across any (other) device connected to that online storage account, in most cases.

g.      Based upon my training and experience, I know that users who possess, receive, distribute, or produce files depicting child sexual abuse material often transfer these files between their different storage devices and online accounts.  Their reasons for doing so include concealing the files, storing them in one account versus another account, or having the files accessible to the user on multiple devices.  I am aware of cases where users transferred CSAM files between devices and/or online accounts, and/or used email or other online messaging accounts to complete the transfer.

h.      The use of mobile applications, also referred to as "apps," continues to be a growing phenomenon related to smartphones and other mobile computing devices.  Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing

13

a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise CSAM, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where CSAM may be stored.

i.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO POSSESS CHILD SEXUAL ABUSE MATERIAL

19.    Based on my previous investigative experience related to child-exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who possess images of child sexual abuse material.

a.     Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in images, or other visual media, or from literature describing such activity.

14

b.        Such individuals may collect sexually explicit or suggestive materials in a variety of media, including images and videos.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.        Such individuals frequently possess and maintain child sexual abuse material in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children frequently retain those materials and child erotica for many years.

d.        Likewise, such individuals often maintain their CSAM images in a digital or electronic format in a safe, secure and private environment, such as a personal computer or other digital devices.  These CSAM images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the CSAM images, which are valued highly.  Such individuals may specifically maintain devices containing or used to access CSAM in their personal vehicles so as to further conceal and hide those devices from others within a shared household.  Some of these individuals also have been found to download, view, and then delete CSAM on their computers or digital devices on a cyclical and repetitive basis.

e.        Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools.  Indeed, the very nature of electronic storage means that evidence of the

15

crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

      f.      Such individuals also may correspond with and/or meet others to share information and materials, correspond with other CSAM distributors/possessors, conceal such correspondence as they do their sexually explicit material, and maintain contact information (e.g., online messaging accounts, etc.) of individuals with whom they have been in contact and who share the same interests in CSAM.

---

[1] *See, e.g., United States v. Sanders*, 107 F.4th 234, 251-52 (4th Cir. 2024) (nine-month delay between criminal acts and issuance of search warrant did not render probable cause stale); *United States v. Ebert*, 61 F.4th 394, 398-99, 401 (4th Cir. 2023) (probable cause for warrant not stale even though "the acts described in it occurred five-to-eight years earlier," in part because "the nature of the property to be seized is not a consumable, like narcotics," and "child pornography is found on computers and other digital equipment that can be readily stored by offenders for years and also can be retrieved during a digital search even after its ostensible deletion"); *United States v. Espinoza*, 9 F.4th 633, 636-37 (8th Cir. 2021) (seven-month delay between single child pornography upload and search warrant did not render probable cause stale); *United States v. Wagner*, 951 F.3d 1232, 1246-47 (10th Cir. 2020) (six-month delay in obtaining warrant for child pornography offenses did not render probable cause stale); *United States v. Touset*, 890 F.3d 1227, 1238 (11th Cir. 2018) (probable cause for search warrant not stale even though it was obtained one-and-a-half years after defendant apparently paid for child pornography); *United States v. Caroll*, 750 F.3d 700, 708 (7th Cir. 2014) (probable cause to search home for child pornography not stale despite five-year delay before search warrant); *United States v. Schesso*, 730 F.3d 1040, 1047 (9th Cir. 2013) (probable cause for child-pornography offense not stale despite delay of 20 months before search warrant); *United States v. Burkhart*, 602 F.3d 1202, 1206-07 (10th Cir. 2010) (probable cause for child-pornography offense not stale despite delay of roughly two years and four months before search warrant); *United States v. Allen*, 625 F.3d 830, 842-43 (5th Cir. 2010) (probable cause for child-pornography offense not stale despite delay of 18 months before search warrant); *United States v. Lemon*, 590 F.3d 612, 614-16 (8th Cir. 2010) (probable cause for child-pornography offense not stale despite delay of 18 months before search warrant); *United States v. Frechette*, 583 F.3d 374, 378-79 (6th Cir. 2009) (probable cause for child-pornography offense not stale despite delay of 16 months before search warrant; reversing contrary holding by district court); *United States v. Morales-Aldahondo*, 524 F.3d 115, 117-19 (1st Cir. 2008) (probable cause for child-pornography offense not stale despite delay of more than three years before search warrant); *see also United States v. Boles*, 914 F.3d 95, 100-01, 103-05 (2d Cir. 2019) (good-faith doctrine applied when agents applied for warrant based on information nearly one year old); *United States v. Contreras*, 905 F.3d 853, 858-59 (5th Cir. 2018) ("year-long interval" between child pornography uploads and search warrant did not render the agents' reliance on the warrant objectively unreasonable).\

g.    Such individuals prefer not to be without their CSAM for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of CSAM throughout the world.

20.    Based on all of the information contained herein, I believe that ZIMMER likely displays characteristics common to receive or possess images of child pornography.

**SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS**

21.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT DEVICE in whatever form it is found. One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

22.    I submit that there is probable cause to believe that records referenced above will be stored on that computer or storage medium, for at least the following reasons:

a.    Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.

17

This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

      d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

23.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the SUBJECT DEVICE because:

      a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs

18

store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media ( e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations; computer activity associated with user accounts; electronic storage media that connected with the computer; and the IP addresses through which the computer accessed networks and the Internet. Such

19

information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.        A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.        The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the

20

records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.       Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.       I know that when an individual uses a computer to obtain or access child sexual abuse material, the individual's computer will generally serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

**BIOMETRIC ACCESS TO THE SUBJECT DEVICE**

24.    This warrant permits law enforcement to compel ZIMMER to unlock the SUBJECT DEVICE should it require biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer iPad devices, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through their fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.    If a device is equipped with a facial-recognition feature, as many Apple devices are, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial

22

characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.  Similar technology allows users to unlock a device specifically through iris recognition.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

g.      Due to the foregoing, if the SUBJECT DEVICE may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of ZIMMER to the fingerprint scanner of the SUBJECT DEVICE; (2) hold the SUBJET DEVICE in front of the face of ZIMMER and activate the facial recognition feature; and/or (3) hold the SUBJECT DEVICE in front of the face of ZIMMER and activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.  The proposed warrant does not authorize law enforcement to compel that all individuals state or otherwise provide the password or any other means that may be used to unlock or access the SUBJECT DEVICE.  Moreover, the proposed warrant does not authorize law enforcement to compel all individuals to identify the specific biometric characteristics

23

(including the unique finger(s) or other physical features) that may be used to unlock or access the SUBJECT DEVICE.

## **CONCLUSION**

25.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A.  I respectfully request that this Court issue a search warrant for the SUBJECT DEVICE, described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

Respectfully submitted,

/s/ Tarah E. Little_____
Tarah E. Little
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to me by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) on this this  21st h day of July 2026.

_____
UNITED STATES MAGISTRATE JUDGE

24

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be searched includes:

1. A Samsung phone IMEI 354526111864365 ("SUBJECT DEVICE"), currently stored at the FBI field office in Bedford, New Hampshire; and

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

1

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. §§ 2252A(a)(2) and (b)(2) (receipt of child pornography). All records, including messages, chats, images, videos, and any other visual depictions, relating to violations of 18 U.S.C. §§ 2252A(a)(2) and (b)(2) (receipt of child pornography).

1. Any records or information relating to the advertisement, distribution, transportation, receipt, access, possession, creation, production, reproduction, storage, transmission, or editing of any visual depictions listed in the previous items, as well as any information relating to the identity of any person involved in such actions or any person depicted in such visual depictions.

2. Additionally, this warrant authorizes the seizure of:

    a. evidence of who used, owned, or controlled the SUBJECT DEVICE— i.e., user attribution—at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the SUBJECT DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

2

d. evidence indicating how and when the SUBJECT DEVICE was accessed or used to determine the chronological context of SUBJECT DEVICE access, use, and events relating to the crime(s) under investigation and to the SUBJECT DEVICE user;

e. evidence indicating the SUBJECT DEVICE user's knowledge and/or intent as it relates to the crime(s) under investigation;

f. evidence of the attachment to the SUBJECT DEVICE of other storage devices or similar containers for electronic evidence;

g. evidence of programs (and associated data) that are designed to eliminate data from the SUBJECT DEVICE;

h. evidence of the times the SUBJECT DEVICE was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT DEVICE;

j. documentation and manuals that may be necessary to access the SUBJECT DEVICE or to conduct a forensic examination of the SUBJECT DEVICE;

k. records of or information about Internet Protocol addresses used by the SUBJECT DEVICE;

l. records of or information about the SUBJECT DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

3.  Records, information, and items relating to violations of the statutes described above, including:

     a.  Records, information, and items relating to the ownership or use of the SUBJECT DEVICE;

     b.  Records and information relating to the identity of the persons suspected of violating the statutes described above;

     c.  Records and information relating to sexual exploitation or abuse of children, including correspondence and communications between users of child pornography and exploitation websites or online chat groups;

     d.  Records and information relating to websites that facilitate the advertising, production, distribution, transportation, receipt, or access to child pornography and child erotica, including any document or page comprising a part of any such website, records and information showing any person's access to or involvement with such websites, any communications between any users of such websites, and any records or information relating to the location, ownership, or control of any such websites;

     e.  Records and information that would identify or assist in identifying the administrators and users of any websites described in the previous subparagraph, including the usernames, passwords, postings, statements, or activities of any such administrators and users;

     f.  Records and information that would identify or assist in identifying the location, ownership, control, or usage of any server or computer hosting or facilitating access

4

to any websites described in the previous subparagraphs, or which would facilitate access to any such server or computer;

g.  Any computer code related to any websites described in the previous subparagraph, including computer code used to host, manage, maintain, administer, access, or facilitate any such websites.

As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones (smartphones and other), tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

During the execution of the search of the SUBJECT DEVICE described in Attachment A, law enforcement personnel are also specifically authorized to compel Mason ZIMMER to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of the SUBJECT

5

DEVICE for the purpose of attempting to unlock the SUBJECT DEVICE's security features in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronically stored information, communications, and other records and information disclosed pursuant to this warrant in order to located evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.